UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

OFFICE AND PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION LOCAL 109 AND
OFFICE AND PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION,

        Plaintiffs,

        v.                              Case No. 08-C-0806

AIR METHODS CORPORATION,

        Defendant.

---

DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (DOC. # 30), GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (DOC. # 28), AND DISMISSING CASE

This case comes before the court on cross motions for summary judgment.

Plaintiffs ask the court to vacate a Railway Labor Act (RLA) Arbitration Award because the

arbitrator ignored clear contract language mandating the use of progressive discipline while

adding language to the contract creating a new workplace civility policy. In addition, it is

asserted that the arbitrator violated public policy supporting workplace and airline safety,

and protecting employees who report safety violations and refuse to fly an unsafe aircraft.

Finally, the plaintiffs argue that the abitrator violated their right to due process. On the

other hand, the defendant, Air Methods Corporation, moves for summary judgment and

dismissal of this action on the ground that the arbitrator confined himself to matters within

the Collective Bargaining Agreement ("CBA") when issuing his RLA award. For the

reasons set forth below, defendant's motion will be granted and this case will be dismissed.

FINDINGS OF FACT

Air Methods Corporation (AMC), an air medical evacuation company, employs approximately 900 pilots at 243 locations in 42 states. (Arbitration Award, Ex. A-1, 3.) AMC provides service to its customers every day at all hours. (CBA, Ex. A-2, ¶ 17.1.)

Bryan Hospital is AMC's only client in Lincoln, Nebraska, where AMC provides air medical evacuation through the "Starcare 5 Program" ("Starcare Program"). (Arbitration Award, Ex. A-1, 3.) AMC pilots fly the helicopters, along with non-AMC "flying hospital teams" consisting of flight nurses and respiratory therapists or other medical personnel. (*Id.*) Pilots and flying hospital teams fly to and from Bryan Hospital. (*Id.*)

Troy V. Montanez, who has a master's degree in aviation safety, began working for AMC in March of 1998. He worked in Lincoln, Nebraska, as a lead pilot. (*Id.*) During the relevant time period in Lincoln, AMC employed two mechanics, Matt Yakel and Kenneth Miller, as well as four pilots, Montanez, Randy Vandenhul, Francis Sager, and Martin Pargee. (*Id.*)

In 2004, the Office and Professional Employees International Union (OPEIU) and its Local 109 became the certified bargaining representative for a nationwide bargaining unit of the AMC pilots. The collective bargaining agreement became effective January 1, 2006, and was amenable on April 30, 2009. Montanez was a member and president of the collective bargaining unit represented by OPEIU, Local 109. (*Id.*) OPEIU, Local 109, and AMC are parties to a CBA effective between January 1, 2006, and April 30, 2009. (CBA, Ex. A-2, 1.)

In July of 2006, a change in local site management occurred at AMC (Arbitration Award, Ex. A-1, 3–4), and Montanez applied for but was not selected for a

2

supervisor position. (*Id.,* at 3–4.) Vanderhul was selected for the position. (*Id.,* at 4.) Montanez took the decision very hard. (*Id.,* at 4.) He became sullen, withdrawn, and allegedly tried to divide crew members. In addition, Montanez kept up a barrage of false accusations against Vandenhul. (*Id.*)

When relieving the day pilot on the night of March 1, 2007, Montanez experienced a "flame-out" trying to start one of the helicopter's engines. (*Id.*) Federal Aviation Administration regulations prohibit a pilot from operating an aircraft that is not airworthy, and provide that the pilot in command is responsible for determining whether that aircraft is in condition for safe flight. 14 C.F.R. § 91.7. According to the AMC manager, a pilot attempts to start the helicopter's other engine as a regular matter of procedure if one engine does not start. (*Id.*, at 4, 21.) However, Montanez did not attempt to start the other engine. (*Id.*) Montanez made an entry concerning the flame-out in a log book as required. (*Id.*, at 4.) On the other hand, he did not notify the maintenance crew of the flame-out, as required by AMC's regulations. (Id., at 19–20.) Further, Montanez did not try to troubleshoot the cause of the flame-out, reposition the aircraft or get a permit to ferry the aircraft to another location, or place a red sock over the flight control to warn and notify other pilots of a mechanical discrepancy with the aircraft. (*Id.* at 4, 5, 19-20.) Placing a red sock on the flight control in such situations calls immediate attention to a mechanical problem. *(Id.* at 5, 20.) Montanez notified Aviation Service Manager Vandenhul and Sager, the next shift pilot. (*Id.*, at 4, 19.)

As a result of Montanez's failure to notify the maintenance crew, mechanics did not begin troubleshooting on the aircraft on the night of March 1, 2007. (*Id.*, at 19.) The helicopter sat on the hospital's helipad for approximately 9 hours before any action was

3

taken.  (*Id*. at 4–5, 19.)  No aircraft was permitted to land on the hospital's helipad during that time, which put the hospital's Starcare Program out of operation.  (*Id.* at 5, 19–20.)

On March 2, 2007, Air Methods' day pilot, Sager, worked to troubleshoot the helicopter and responded to two flight requests.  (*Id.* at 5, 21.)  The night of March 2, 2007, Montanez again experienced problems with the aircraft and notified Air Methods' national communications center that he was taking the helicopter out of service.  (*Id.,* at 5, 21.)  However, Montanez did not fill out a log book, as required.  (*Id.* at 5, 21.)  Montanez also did not place a red sock over the flight control after the March 2, 2007, flame out.  (*Id.*, at 5, 21.)

Montanez was placed on administrative leave pending investigation of the events of March 1 and 2, 2007.  (Answer, ¶ 16.)  After investigation, AMC issued a Letter of Counseling to Montanez for failing to comply with approved policies and procedures relating to removal of an aircraft from service and entering problems into a log.  (*Id.,* at 5, 19.)  The Letter of Counseling stated that any further violations may lead to additional discipline up to and including termination.  (*Id.,* at 5.)  On May 15, 2007, Montanez filed a written grievance over the Letter of Counseling, saying that it was unfair, unjust, discriminatory, and inconsistent with sound aviation principles.  (*Id*.)  In addition, he raised additional safety complaints to AMC.

The Union filed a grievance protesting the Letter of Counseling on May 15, 2007.  In the grievance the Union further maintained that the Letter of Counseling was inconsistent with sound aviation principles.

On August 2, 2007, the System Board of Adjustment heard the May 15, 2007, grievance.  (*Id.,* at 6.)  During the August 2, 2007 hearing, Montanez raised several claims

4

of unsafe practices in Lincoln, Nebraska. (*Id*.) Montanez was asked whether the allegations were so serious that the Lincoln, Nebraska base should be shut down. (*Id.*) Montanez did not say "yes." (*Id.*) Over the course of a month, Air Methods management determined that the safety charges raised by Montanez were without merit. (*Id.*)

On or about August 16, 2007, Brian Foster, AMC's Director of Operations, met with Montanez's coworkers to discuss Montanez. (*Id., at 26.*) Foster told Montanez to change the way he was communicating with and dealing with Air Methods' pilots and mechanics. (*Id.*)

After Yakel and Miller submitted transfer requests in August of 2007, Mike Stacey, Air Methods' Regional Aviation Director, met with Montanez and Vandenhul. (*Id., at 6, 37.*) During the meeting, Montanez saw his coworkers' transfer requests and stated that he "[had] to act this way because of [his] grievance." (*Id.* at 6.) Montanez did not express any remorse for his conduct and did not accept blame for his actions. (*Id.*, at 6–7.)

AMC's management determined that Montanez was continually creating a sense of distrust and discontent that adversely affected Air Methods' Lincoln, Nebraska base. (*Id., at 5, 25–26.*) AMC terminated Montanez on or about September 10, 2007, for creating and continuing an unnecessarily stressful and non-productive work environment. (*Id., at 7, 35.*) The Letter of Termination stated in part that Montanez had created a nonproductive work environment which caused long-term personnel to request transfers in order not to work with Montanez. (*Id.*)

The Union filed a grievance protesting the discharge of Montanez. The May 15 grievance concerning the Letter of Counseling and the September 10 grievance concerning the discharge were heard together before arbitrator James McBrearty in

5

Lincoln, Nebraska, on January 17, 18, 20, and 21, 2008. (Arbitration Award. at 1.) The Union did not call any witnesses during the Arbitration hearing, but cross-examined each witness called by Air Methods. (*Id.* at 3.) The Union objected to the hearsay evidence regarding Shaner and others. Both parties submitted post-hearing briefs. (*Id.* at 2.)

On or about May 5, 2008, the arbitrator issued an award finding that AMC had just cause to discipline and terminate Montanez. (*Id.* at 43.) Among other facts, the arbitrator made the following findings: "[t]he record [was] replete with testimony from management witnesses that . . . they became convinced that Mr. Montanez was not a team player; Montanez called pilots, but not Air Methods' officials, regarding safety issues; Montanez divided the medical crew by making some employees fearful of flying the helicopter; Montanez "manipulated safety matters to the point of abuse," Montanez created a hostile work environment to such a degree that two mechanics wanted transfers and one pilot sought outside employment; Montanez's behavior "endangered the Company's contract with its only client" in Lincoln, Nebraska. (*Id.,* at 35.) The arbitrator found that Montanez had "no adequate explanation of his conduct, leading to the conclusion that he was guilty as charged." (*Id.* (emphasis in original).) In addition, the arbitrator rejected the Union's argument that AMC did not use progressive discipline before terminating Montanez. (Id. at 16–17, 36–37.)

The arbitrator further stated that Montanez was warned about the two requests for transfers from the mechanics at the Lincoln base, as well as on the possible resignation of a fellow pilot, all the result of his behavior. (*Id.,* at 36–37 (emphasis in original).) The arbitrator also found that management conveyed to Montanez the complaints made by Shaner, the Director of the Starcare Program, who was "extremely

6

dissatisfied with the behavior and actions of Mr. Montanez," (Arbitration Award at 37), and that Montanez was not ignorant of reactions to his behavior by his coworkers and Ms. Shaner. (*Id.,* at 29–32, 36–37.) Finally, the arbitrator stated that Montanez "was given the chance to turn things around, but chose not to avail himself of such opportunity." (*Id.,* at 16–17, 36–37.)

On or about September 24, 2008, plaintiffs filed their complaint asking the court to vacate the arbitration award, alleging: (1) the award does not "draw its essence from the [CBA];" (2) the award violates public policy; and (3) the arbitrator violated the Union's due process rights. (Compl., ¶¶ 28, 31, 34.) On October 21, 2008, AMC moved to dismiss the complaint, which the court denied. (Doc. Nos. 11, 12, 19.)

The CBA contains several provisions that are relevant to the underlying grievance and arbitration. (CBA, Ex. A-2.) Section 4.1 of the CBA provides that "[t]he Union recognizes that the Management of the business of the Company and the direction of the working force are vested exclusively with the Company, subject to the expressed provisions of this Agreement." (*Id.,* § 4.1.) Section 4.2 of the CBA reserved the right of the Company to "retain all rights to manage or operate its business and work force, including but not limited to the right to . . . determine the . . . qualifications of Pilots it may employ and to adopt, modify and rescind reasonable work and safety rules." (*Id.,* § 4.2.)

Section 9.1 of the CBA provides that "[p]ilots may be subject to disciplinary action, up to and including discharge for cause including violation or infraction for company rules or policies, or for violating this Agreement. The Company will continue to use a system of progressive discipline." (CBA § 9.1.) The CBA's Discipline and Discharge provisions do not define a specific step-by-step progressive discipline procedure. (*See id.*)

Section 9.4 of the CBA states that "[c]ustomer complaints or correspondence of a derogatory nature shall not serve as the basis for discipline after twelve (12) months from the date of issuance unless within the twelve (12) month period there has been a recurrence of the same or similar nature." (*Id.*, ¶ 9.4.) Section 9.6 of the CBA states that "[a] Pilot may be immediately removed from the payroll and suspended or discharged without pay if he violates the FAA Drug/Alcohol policy or commits other acts of serious misconduct." (*Id.,* ¶ 9.6.)

Article 36 of the CBA sets forth the Company's "Productive Work Environment Policy" as follows:

Section 36.1

It is agreed that the Company, as a responsible corporate citizen, is committed to maintaining a hospitable, cooperative work environment that promotes professionalism, common courtesy and mutual respect among all levels of employees, supervisors, managers, and executives. To advance that commitment, the Company has adopted and will communicate to employees the productive work environment policy that strictly prohibits sexual and workplace harassment on the basis of race, color, creed, gender, religion, national origin, age, sexual orientation or disability or any other status protected by either Federal or State statute. This policy shall not be amended during the term of this agreement unless required by law.

Section 36.2

The Union agrees to support the provisions of the Air Methods corporate productive work environment policy. Each Pilot will be required to read, understand and sign an acknowledgment of this policy, which will be placed in his personnel file.

(CBA § 36.)

As required by the RLA, the CBA established a System Board of Adjustment to arbitrate disputes under the CBA. (CBA, Ex. A-2, Art.7.) The CBA provides that "[d]ecisions by the Board are final and binding on the Company, the Union and the affected Pilots, provided [the decision does not modify, add to or otherwise alter or amend any of the terms of the CBA]." (*Id.*, §§ 7.9, 7.4.)

## SUMMARY JUDGMENT STANDARD

The court's review over the arbitration award at issue is exceptionally narrow. *Brotherhood of Locomotive v. Union Pacific R. Co.*, 522 F.3d 746, 757 (7th Cir. 2008). Indeed, review is "among the narrowest known to the law." *Steffens v. Brotherhood of Ry., Airline and Steamship Clerks*, 797 F.2d 442, 447 (7th Cir.1986). As explained by the Seventh Circuit:

> As we have said before, the question before a federal court "is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." *Hill v. Norfolk & W. Ry.*, 814 F.2d 1192, 1195 (7th Cir. 1987). An arbitration award made by the Board may be overturned "only if the reviewing court is convinced that [the arbitrator] was not trying to interpret the collective bargaining contract, but that instead he resolved the parties' disputes according to his private notions of justice." *Bhd. of Locomotive Eng'ring v. Atchison, Topeka and Sante Fe R.R.*, 768 F.2d 914, 922 (7th Cir.1985)

*Brotherhood of Locomotive*, 522 F.3d at 757.

Still, a district court may "set aside an award in whole or in part or remand the matter to the board for further action on the following grounds: (1) failure of the board to comply with the requirements of the RLA; (2) failure of the board to confine itself to matters within its jurisdiction; or (3) fraud or corruption by a member of the board making the

9

award." *Wilson v. Chicago and North Western Trans. Co.*, 728 F.2d 963, 966 (7th Cir. 1984).  The board's jurisdiction "is limited exclusively to the interpretation or application of existing agreements:" therefore, the decision must get its essence from the collective bargaining agreement. *Lyons v. Norfolk & Western Railway Co.*, 163 F.3d 466, 469 (7th Cir.1999). If the board interpreted the contract, its ruling stands. *Id.*, 163 F.3d at 470.

Acknowledging that the standard of review is "very narrow," plaintiffs maintain that this is a rare case where the award ignored the clear contract language requiring a system of progressive discipline.  Article 9, Section 9.1 of the CBA provides, in relevant part,  as follows:

> Pilots may be subject to disciplinary action, up to and including discharge for just cause including violation or infraction of company rules or policies, or for violating this Agreement.  The Company will continue to use a system of progressive discipline.

In addition, Article 7, Section 7.4 of the CBA states that:

> Neither the Systems Board or Arbitrator shall have any jurisdiction to modify, add to or otherwise alter or amend any of the terms of this Agreement or to make any decision that has such an effect.

CBA, Art. 9, Section 7.4. Finally, Article 36, Section 36.1, sets forth the Productive Work Environment Policy:

> It is agreed that the Company, as a responsible corporate citizen, is committed to maintaining a hospitable, cooperative work environment that promotes professionalism, common courtesy and mutual respect among all levels of employees, supervisors, managers, and executives.  To advance that commitment, the Company has adopted and will communicate to employees the productive work environment policy that strictly prohibits sexual and workplace harassment on the basis of race, color, creed, gender, religion, national origin, age,

10

sexual orientation or disability or any other status protected by either Federal or State statute. This policy shall not be amended during the term of this agreement unless required by law.

It is difficult to argue that the arbitrator failed to interpret the CBA. The arbitrator incorporated and discussed each of the relevant sections of the CBA while adding emphasis to the language supporting his award. (Ex. A-1, 8-11.) It was the plaintiffs' position that "the Letter of Counseling and the subsequent discharge of Troy V. Montanez were without just cause." However, the arbitrator concluded just cause by interpreting the CBA and making findings of fact. Specifically, he found that a preponderance of the evidence justified the Letter of Counseling inasmuch as Montanez did not contact maintenance on March 1, 2007, in violation of the general Operations Manual, and did not make an entry in the logbook on March 2, 2007. In addition, he found that a preponderance of the evidence supported the discharge because management believed Montanez was not a team player, did not follow company protocol regarding safety issues, divided medical crews, created a hostile work environment and that his behavior jeopardized AMC's relationship with its only client in Lincoln.

The CBA does not define "progressive discipline." Nevertheless, the arbitrator found that Montanez was given a Letter of Counseling for the events of March 1 and 2, 2007, and was interviewed on at least two occasions after the Letter of Counseling by several members of the management team. Based on the record, the arbitrator concluded that Montanez was warned about the two requests for transfer and the concerns of the Director of the Starcare Program regarding his behavior. Also, Stacey testified that he had a meeting with Montanez and showed Montanez a copy of an e-mail from Yakel and Miller

requesting transfers from Lincoln because of Montanez. Indeed, the arbitrator "could not believe that Montanez was ignorant of the reactions to his behavior," and wrote that "over the course of the summer, 2007, Montanez was given the chance to turn things around, but chose not to avail himself of such opportunity." These factual determinations support the arbitrator's finding that the letter and discharge were supported by just cause.

Plaintiffs submit that leading treatises on arbitration and arbitration decisions establish that any system of progressive discipline requires more, including steps of escalating discipline, short of termination, and notice of disciplinary consequences. However, as plaintiffs note, "whether there are two escalating steps or four is not an issue." ( Pls. Reply Brief, 9.) The arbitrator found that the company attempted to address and resolve their concerns prior to termination. Therefore, plaintiffs' argument is nothing more than their opinion as to how the arbitrator should have interpreted the CBA.

Additionally, plaintiffs maintain that the arbitrator based his decision on his personal notions of fairness because the CBA had no policy requiring termination for "creation and continuation of unnecessary stressful and nonproductive work environment," and "creating a sense of distrust and discontent," nor a policy requiring termination because of customer dissatisfaction. Article 36, Section 36.1, states that the company is "committed to maintaining a hospitable, cooperative work environment that promotes professionalism, common courtesy, and mutual respect among all levels of employees, supervisors, managers, and executives." Plaintiffs quote the portion of Section 36.1 incorporating the anti-discrimination statutes, but there is no limiting language in the section. Also, nothing in the CBA defines just cause or prohibits discharge for any reason other than a violation

12

of the anti-discrimination statute.  Regardless of whether the court agrees or disagrees with the arbitrator's interpretation of this section, it is his interpretation that controls.

Next, plaintiffs submit that the arbitrator's award should be vacated because it violates the well-defined and dominant public policy supporting workplace and airline safety, and protecting employees who report safety violations and refuse to fly unsafe aircraft.  According to plaintiffs, the "falsity of the employer's explanation and arbitrator's acceptance of such explanation permits an inference of retaliation."  Put simply, retaliatory termination may be inferred because there was no good reason for Montanez's discharge and ample evidence that he engaged in safety activities.

Whether violation of public policy may be the basis for vacating an RLA award was the subject of defendant's motion to dismiss, and defendant acknowledged the issue has not been decided by the Seventh Circuit.  However, the Eighth and Eleventh Circuits have held that public policy review is permitted.  *Union Pacific R.R. Co. v. United Transp. Union*, 3 F.3d 255, 258 (8th Cir. 1993); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n*, 861 F.2d 665, 674 (11th Cir. 1988).

In any event, this court has already rejected plaintiffs' initial premise that the arbitrator upheld the termination based on a non-existent policy.  Therefore, it will not find that this claimed "falsity" permits an inference of employer retaliation.  Moreover, the arbitrator did not find that the company discharged Montanez because he reported safety violations.  Instead, the arbitrator found that the company's safety policies were not followed, that Montanez did not stay and help the mechanics troubleshoot the problem, and did not try to reposition the helicopter so it would not impede air service at Bryan Hospital

13

following the flame-out. The arbitrator found Montanez's actions "unacceptable behavior for any pilot, especially a lead pilot."

With respect to a transfer pump issue – raised for the first time at the Systems Safety Board hearing respecting Montanez's Letter of Counseling – Montanez told Hamilton that he had not brought the safety issue up earlier because it was not his responsibility. In addressing this issue, the arbitrator noted the testimony of management, as well as Montanez's comment. Thus, the arbitrator concluded that the company was "rightly concerned with the timing and matters of the alleged safety issues raised on various occasions by Mr. Montanez" and that Montanez was acting in a detrimental and counterproductive manner. On these facts, this court cannot find the arbitrator's award violates public policy.

Finally, the plaintiffs argue that the arbitator's award should be vacated because the arbitrator violated their due process rights. They note that the termination letter that Montanez received made no mention of customer dissatisfaction nor over reporting of safety issues, yet the arbitrator devoted significant amounts of the award to discussion of dissatisfaction and the safety issues. These issues – raised at the hearing – involved hearsay evidence which, according to the plaintiffs, deprived them of their right to confront witnesses. Further, the arbitrator referred to statements by the Director of Bryan Hospital's Medical Air Transport Program, Jan Shaner, and AMC employees "Mick" Sager and Matt Yakel, who did not testify.

In the Seventh Circuit, due process is a ground for reviewing an arbitration award under the RLA. *Pokuta v. Trans World Airlines, Inc.*, 191 F.3d 834, 839 (7th Cir.1999). Due process requires "the opportunity to be heard at a meaningful time and in

a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed.2d 18 (1976).  An arbitrator is required to provide a "fundamentally fair" hearing.  *Gerica Ltd. v. Pharm. Basics, Inc.*, 125 F.3d 1123, 1130 (7th Cir. 1997).  A hearing is fundamentally fair if it meets the minimal requirements of fairness: adequate notice, a hearing on the evidence and an impartial decision by the arbitrator.  *Int'l Bhd. Elec. Workers v. CSX Transp. Inc.*, 446 F.3d 714, 720 (7th Cir. 2006).  The requirements of due process are "relaxed when the tribunal is an arbitral tribunal rather than a court." *United Transp. Union*, 284 F.3d at 712.  The parties, who have chosen to remedy their disputes through arbitration rather than litigation, should not expect the same procedures they would find in the judicial arena. *Generica*, 125 F.3d at 1130.

This is not a case where the arbitrator altered – without warning – the rules for access to the hearing.  The plaintiffs had notice of the hearing, participated in the hearing, and the arbitrator was impartial.  Plaintiffs chose not to call witnesses knowing that failure to comply with reporting requirements and the work environment/customer satisfaction were at issue.  The hearsay evidence referred to by plaintiffs is contained in investigative reports, and plaintiffs have cited to nothing in the CBA that would bar consideration of the report.  Moreover, Courts have found that arbitrators are not bound by formal rules of procedure and evidence.  *See Nat'l Post Office Mailhandlers v. United States Postal Service,* 751 F.2d 834, 841 (6th Cir.1985).  Further, the arbitrator noted that he had a complete record of the testimony of management witnesses, Chris Bassett, Ed Stockhausen, Chris Meinhardt, Mike Stacey, Rob Hamilton, Brian Foster and Kenneth Miller.  Their testimony, according to the arbitrator, weighed heavily against the behavior of

15

Montanez. (Ex. A-11, 36.) Consequently, this record precludes a finding that plaintiffs were denied a fundamentally fair arbitration proceeding.  Now, therefore,

IT IS ORDERED that plaintiffs' motion for summary judgment is denied.

IT IS FURTHER ORDERED that defendant's motion for summary judgment is granted.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 14th day of September, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE